**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


KEITH CALDWELL,            )
                                    )        Civil Action No. 16 – 1848
             Petitioner,     )
                                    )
           v.                  )        Magistrate Judge Lisa Pupo Lenihan
                                    )
LARRY MAHALLY and THE    )
ATTORNEY GENERAL OF THE  )
STATE OF PENNSYLVANIA,    )
                                    )
            Respondents.   )


## MEMORANDUM OPINION[1]

Pending before the Court is an Amended Petition for Writ of Habeas Corpus ("Habeas Petition") filed by Petitioner Keith Caldwell ("Petitioner") pursuant to 28 U.S.C. § 2254. (ECF No. 15). Petitioner challenges the judgment of sentence imposed after he was convicted by a jury of first-degree murder for the shooting death of his grandfather. For the following reasons, the Habeas Petition will be dismissed as untimely and denied in the alternative. A Certificate of Appealability will also be denied.

### A.    Factual Background

The factual background of this case was outlined by the trial court as follows:

> This matter arises out of the murder of Nathaniel Caldwell on March 9, 2007. Defendant, Keith Caldwell, was the victim's grandson and lived with the victim in a first floor apartment at 7013 Frankstown Avenue for approximately two years prior to the murder. Defendant previously lived with his mother and

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment. (ECF Nos. 8, 19.)

stepfather until he was sixteen and then lived with an aunt for a short period of time before moving in with his grandfather. At one time after moving in with the victim, Defendant had a disagreement with the victim and was forced to leave the residence but Defendant was later allowed to move back. The victim's wife and Defendant's grandmother, Mary Caldwell, lived in a second floor apartment at the Frankstown Avenue address. Although they lived in separate apartments, Mrs. Caldwell prepared meals for her husband and Defendant and would routinely see them throughout the course of the day. On the day of the murder Mrs. Caldwell first saw the victim at approximately 7:00 a.m. when he came to her apartment for breakfast, staying until approximately 9:30 a.m. He then returned to his apartment while she prepared to go to work. At approximately 11:00 a.m. she called the victim to tell him she was leaving for work. Mrs. Caldwell did not see Defendant during the course of the morning. Mrs. Caldwell described Defendant's relationship with the victim as close, but acknowledged that there were occasional disagreement between them because of Defendant's lack of motivation and not wanting to go to school.

The evidence further established that Ernie Daniels, a next door neighbor who knew the victim and Defendant, came home on the afternoon of March 9th and was putting away groceries in his kitchen second floor apartment. The window in the kitchen was opened and Daniels heard a sound he described like someone kicking or banging in his back door. When Daniels heard the noise he looked out his back window and saw Defendant running from the back of the apartment building next door towards the front. Daniels testified that although Defendant was wearing a "hoodie" it was daylight and he could clearly see his face. Daniels testified that it was approximately 45 minutes later that he saw the police outside the victim's home.

The victim's daughter, Valerie Caldwell, testified that she went to visit her father's apartment after work, arriving shortly before 5:00 p.m. and found him with a gunshot wound to his head and called 911 at 5:04 p.m. She noted the smell of gunpowder when she entered the apartment. Uniformed officers responded within minutes, finding the victim sitting in a chair with a gunshot wound to the head. The officers secured both the first and second floor apartments finding no one present. They also searched the basement area and found the basement door partially kicked in with a footprint on the door. However, the basement door was only opened approximately two to three inches because a forty foot ladder prevented the door from opening further. The rear kitchen door was locked and there were no other signs of forced entry. There was no evidence that either apartment was ransacked and nearby wrapped coins and the victim's wallet, under his mattress, were undisturbed. A search outside the apartment revealed a .357 Magnum handgun, later identified as being owned by the victim and used in the shooting, lying on the ground in the rear of the building near the steps leading to the basement door that was partially kicked in. The victim's son, Nathaniel

Caldwell, testified that when he went through his father's belongings the day after the shooting he found nothing missing.

Paramedics found the victim's body sitting in a chair with a gunshot wound to the head. The body was still warm and there were no rigor or stiffening of the body at the time that he was pronounced dead at 5:08 p.m. The coroner's office retrieved the body at 7:19 p.m. and a liver core body temperature and the lack of rigor indicated that the victim had died within two to four hours of the taking of the core body temperature.

An autopsy performed by Dr. Michael Panella of the Allegheny County Coroner's Office determined that the victim died of a single gunshot wound to the head with a bullet traversing the brain and lodging in the back of the neck on the left side. Dr. Panella opined that the wound was a close contact wound indicating that the shooter had placed the gun directly against the victim's skull when firing the gun. The bullet was retrieved and found on ballistic examination to be a 38 caliber bullet that was fired from the victim's .357 handgun, the gun that was found at the rear of the house.

Detective George Sattler also testified that while on the scene investigating, Defendant was seen returning to the residence and had to be restrained from entering the apartment to see his grandfather. At that time Defendant was shown the gun that was found at the rear of the residence, which Defendant identified as being the victim's gun. As Defendant lived with the victim, Defendant was then taken to the Detective's office where he was questioned at approximately 7:45 p.m. that evening. Defendant acknowledged that he had some disagreements with his grandfather in the past and at one point was made to leave the home but ultimately was allowed to return. Defendant further informed Detective Sattler that on the night before the murder he had come home late and the victim was upset with him and wanted him out of the residence. However, he was allowed to stay the night. Defendant stated that he saw the victim go upstairs at approximately 7:00 a.m. the following morning but Defendant remained in bed until late morning or early afternoon. Defendant stated he did not see his grandfather again but remained in the residence until approximately 4:30 p.m. at which time he called the emergency 911 number to ask if his grandfather could throw him out of the house.

The evidence established that Defendant called the Allegheny County 911 at 4:06 p.m. to ask what he characterized as a "legal question". Defendant then asked the 911 dispatcher, "I am only 19 and my family, my lawyer never gave me a chance to get like secure in life. Is it legal for them to kick me out at 19 years old?" The transcript of the phone call indicates that the dispatcher informed Defendant that he could not answer the question but could either send an officer to assist him or give him a phone number to talk to an

officer over the phone.  Defendant was then given the phone number for the Zone 5 police station and the call to 911 ended.

Officer Henry Wilson testified that he was the Zone 5 desk officer on March 9, 2007 and that at approximately 4:20 p.m. he received a call from an unknown male asking if he could be kicked out of his home.  Officer Wilson advised the caller that if he was 18 years of age he could be.  Officer Wilson told him there was nothing that could be done and that the caller then thanked him and hung up.  Officer Wilson described the caller as being "pleasant".

During the initial interview on March 9, 2007 Defendant also told Detective Sattler that after calling 911 and the Zone 5 station, he had called a cousin to see if he could move in with him but it was "left up in the air whether or not he could move in".  Defendant then said that he had left the residence and went approximately two blocks to a local market, locking the door to the apartment after he left.  Defendant produced a receipt showing the purchase of items at 5:09 p.m.  Defendant then indicated that shortly after leaving the market he received a phone call from a relative telling him that his grandfather was shot and he immediately went back to the residence.  Further, as he was making his way home he heard a cell phone ringing that was lying on the ground and he picked it up and recognized it as his grandfather's.  Detective Sattler also indicated that Defendant told him he was not upset at all about his grandfather kicking him out of the house.  Defendant acknowledged that he knew that his grandfather kept a .357 revolver handgun in the residence.  During the interview Detective Sattler noticed what he believed to be a stain on the Defendant's right boot and consent was obtained to collect Defendant's boots and clothing.  Buccal swabs for DNA testing and a gunshot residue kit were also obtained.

DNA testing of the gun used in the shooting, Defendant's jacket, jersey, sweatshirt, shirt and jeans were either negative or inconclusive for blood stains or consistent with Defendant's own blood.  However, a blood stain on Defendant's right boot matched the victim's blood.

Detective Kimberly Braddock also interviewed Defendant on March 9, 2007 at approximately 10:45 p.m.  Defendant also acknowledged to Detective Braddock that he came home late the night before the victim was killed and they had a "little confrontation" because Defendant was late.  Defendant indicated that it was not an argument and denied that there was any conversation about him being kicked out of the house.  He again repeated his accounts of that day, including going to the store in the afternoon.

Detective Braddock also testified that as she and her partner took the Defendant home that evening he "was overheard talking on the phone asking why someone would shoot grandpa in the head."  At that point his partner asked

Defendant how he knew his grandfather was shot in the head and Defendant responded by saying "he must have been shot in the head if he died instantly."

(Resp't Exh. 11, ECF No. 10-3, pp.3-8) (internal citations to trial transcript omitted).

## B.    Procedural Background

Petitioner was charged by Criminal Information filed in the Court of Common Pleas of Allegheny County, Pennsylvania, Criminal Division, with one count of Criminal Homicide, 18 Pa. C.S.A. § 2501, in connection with the murder of his grandfather on March 9, 2007. (Resp't Exh. 2; ECF No. 10-1, pp.19-21.) On March 10, 2008, Petitioner, represented by Robert Foreman, Esq. ("Attorney Foreman"), appeared for a jury trial before the Honorable Randal B. Todd ("Judge Todd"). Two days later, the jury found Petitioner guilty of first-degree murder and he was sentenced to life imprisonment on April 24, 2008. (Resp't Ex. 2; ECF No. 10-1, p.19.) Petitioner, through Thomas N. Farrell, Esq. ("Attorney Farrell") filed a post-sentence motion on May 5, 2008 (Resp't Ex. 4; ECF No. 10-1, pp.32-36), which Judge Todd denied on May 7, 2008 (Resp't Ex. 5; ECF No. 10-1, p.37).

On June 3, 2008, Petitioner, through Attorney Farrell, appealed his judgment of sentence arguing that there was insufficient evidence to support his first-degree murder conviction. (Resp't Exh. 6; ECF No. 10-2, pp.1-17); (Resp't Exh. 9; ECF No. 10-2, pp.34-37.) On January 18, 2011, Judge Todd filed his Opinion pursuant to Pennsylvania Rule of Appellate Procedure ("Pa. R.A.P.") 1925(a). (Resp't Exh. 11; ECF No. 10-3, pp.1-25.) The Superior Court of Pennsylvania affirmed Petitioner's judgment of sentence on November 14, 2011. (Resp't Exh. 15; ECF No. 10-7, pp.1-13.) Petitioner, through Attorney Farrell, filed a Petition for Allowance of Appeal (Resp't Exh. 17; ECF Nos. 10-8, 10-9), which the Supreme Court of Pennsylvania

denied on April 25, 2012 (Resp't Exh. 19; ECF No. 10-10, p.2).  Petitioner did not file a petition for writ of certiorari with the United States Supreme Court.

On December 5, 2012, Petitioner filed a *pro se* Motion to Set Aside and/or Vacate Judgment Procured Through Fraud, which the court construed as a petition pursuant to Pennsylvania's Post-Conviction Relief Act ("PCRA").  (Resp't Exh. 20; ECF Nos. 11-1, 11-2.) Judge Todd, acting as the PCRA court, appointed Charles Robert Pass, III, Esquire, ("Attorney Pass") to represent Petitioner for those proceedings, and on February 4, 2013, Attorney Pass filed a Motion for Leave to Withdraw as counsel pursuant to <u>Turner</u>[2] and <u>Finley</u>[3].  (Resp't Exh. 21; ECF No. 11-3.)  On May 20, 2013, Judge Todd issued an order that granted Attorney Pass leave to withdraw and gave Petitioner notice that his PCRA petition would be dismissed.  (Resp't Exh. 22; ECF No. 11-4, pp.1-4.)  Petitioner filed a *pro se* response to the PCRA court's notice (Resp't Exh. 23; ECF No. 11-4, pp.5-9), and the petition was dismissed without a hearing on June 28, 2013 (Resp't Exh. 24; ECF No. 11-4, pp.10-11).  Petitioner appealed *pro se* (Resp't Exh. 25; ECF No. 11-4, pp.12-19), and, on January 6, 2014, Judge Todd issued his Opinion pursuant to Pa. R.A.P. 1925(a) (Resp't Exh. 26; ECF No. 11-4, pp.20-40).  The Superior Court affirmed the dismissal of the PCRA petition on July 15, 2014.  (Resp't Exh. 30; ECF No. 11-7.)  Petitioner moved for reconsideration (Resp't Exh. 31; ECF Nos. 12-1, 12-2), but his motion was denied by the appellate court on September 4, 2014 (Resp't Exh. 32; ECF No. 12-3, p.1).  He then filed a *pro se* Petition for Allowance of Appeal (Resp't Exh. 34; ECF Nos. 12-4, 12-5), which the Pennsylvania Supreme Court denied on December 30, 2014 (Resp't Exh. 36; ECF No. 12-6, p.2).

---

[2] <u>Commonwealth v. Turner</u>, 544 A.2d 927 (1988)
[3] <u>Commonwealth v. Finley</u>, 550 A.2d 213 (1988)

On January 9, 2014, while Petitioner's appeal of his PCRA petition was pending before the Superior Court, he filed a *pro se* Application Seeking an Order to Conduct Forensic D.N.A. Testing pursuant to 42 Pa. C.S.A. § 9543.1. (Resp't Exh. 37; ECF No. 12-6, pp.3-7.) The Commonwealth was directed to respond and they filed an Answer to the motion on February 7, 2014. (Resp't Exh. 38; ECF No. 12-6, pp.8-32.) On March 27, 2014, Judge Todd entered an order staying the request for testing until the conclusion of Petitioner's appeal. (Resp't Exh. 39; ECF No. 12-6, pp.33-34.) On July 17, 2014, after the Superior Court had affirmed dismissal of Petitioner's PCRA petition, Judge Todd entered an order giving notice of the court's intention to dismiss Petitioner's motion for DNA testing. (Resp't Exh. 40; ECF No. 12-7, pp.1-3.) Petitioner filed a response to the court's notice on August 11, 2014 (Resp't Exh. 42; ECF No. 12-7, pp.11-20), and, on September 4, 2014, the court dismissed the motion (Resp't Exh. 43; ECF No. 12-7, p.21).

On September 19, 2014, Petitioner filed a *pro se* Affidavit and Notice/Motion to Compel, which the court construed as a second PCRA petition. (Resp't Exh. 44; ECF No. 12-7, pp.22-33.) On October 27, 2014, Judge Todd entered an order giving notice of the court's intention to dismiss the petition. (Resp't Exh. 45; ECF No. 12-7, pp.34-36.) On November 19, 2014, the petition was dismissed as untimely. (Resp't Exh. 46; ECF No. 12-7, pp.37-38.) Petitioner appealed *pro se* (Resp't Exh. 47; ECF No. 12-7, pp.39-45), and Judge Todd filed his Pa. R.A.P. 1925(a) Opinion on July 20, 2015 (Resp't Exh. 49; ECF No. 12-8, pp.7-13). On April 15, 2016, the Superior Court affirmed the dismissal of the second PCRA petition. (Resp't Exh. 53; ECF No. 13-5, pp.1-4.) Petitioner moved for reconsideration (Resp't Exh. 54; ECF No. 13-5, pp.5-14) and his motion was denied on June 6, 2016 (Resp't Exh. 55; ECF No. 13-5, p.15). On July 5, 2016, Petitioner filed a *pro se* Petition for Allowance of Appeal (Resp't Exh. 57; ECF No. 13-

6, pp.1-17) and the Pennsylvania Supreme Court denied it on November 1, 2016 (Resp't Exh. 58; ECF No. 13-6, p.18).

On January 5, 2015, while the appeal of Petitioner's second PCRA petition was pending before the Superior Court, Petitioner filed another *pro se* Application Seeking an Order to Conduct Forensic D.N.A. Testing pursuant to 42 Pa. C.S.A. § 9543.1. (Resp't Exh. 59; ECF No. 13-6, pp.19-39.) The Commonwealth responded to the motion on February 12, 2015 (Resp't Exh. 60; ECF No. 13-7, pp.1-28), and, on March 3, 2015, Judge Todd denied the motion (Resp't Exh. 61; ECF No. 13-7, pp.29-30). Petitioner appealed *pro se* (Resp't Exh. 62; ECF No. 13-7, pp.31-37), and, on July 20, 2015, Judge Todd filed his Pa. R.A.P. 1925(a) Opinion (Resp't Exh. 63; ECF No. 13-7, pp.38-47). On April 15, 2016, the Superior Court affirmed the denial of Petitioner's motion for DNA testing. (Resp't Exh. 67; ECF No. 14-5, pp.1-6.) Petitioner's motion for reconsideration that he filed on May 2, 2016 (Resp't Exh. 68; ECF No. 14-5, pp.7-28), was denied by the Superior Court on June 6, 2016 (Resp't Exh. 69; ECF No. 14-5, p.29). On July 1, 2016, Petitioner filed a *pro se* Petition for Allowance of Appeal (Resp't Exh. 71; ECF No. 14-6, pp.4-21) that the Pennsylvania Supreme Court denied on November 15, 2016 (Resp't Exh. 72; ECF No. 14-6, p.22).

Petitioner's original Petition for Writ of Habeas Corpus was signed on December 6, 2016 and postmarked the following day. (ECF No. 1.) The case was closed following the Court's denial of Petitioner's motion to proceed *in forma pauperis* and then subsequently reopened when Petitioner paid the filing fee on January 6, 2017. (ECF Nos. 2, 3.) His original Petition for Writ of Habeas Corpus was docketed by the Clerk on January 6, 2017 (ECF No. 4), and Respondents filed an Answer to it on February 15, 2017 (ECF Nos. 9-14). Petitioner then filed what the Court

construed as an Amended Petition for Writ of Habeas Corpus ("the Habeas Petition") on April 5, 2017 (ECF Nos. 15, 16), and Respondents filed an Answer to it on April 18, 2017 (ECF No. 17).

## C. **Petitioner's Claims**

Petitioner raises three claims for relief in his Habeas Petition. First, he claims that he was denied the effective assistance of counsel when his trial counsel improperly argued the significance of the DNA evidence, and he also claims that trial counsel was ineffective for failing to object to the Commonwealth's presentation of the DNA evidence. Second, Petitioner claims that all counsel were ineffective for failing to raise a claim that he was questioned by detectives in violation of his constitutional rights. Third, he alleges a violation of due process because the Commonwealth did not present sufficient evidence to prove him guilty of first-degree murder.

## D. **AEDPA Statute of Limitations**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year limitations period for state prisoners seeking federal habeas review. It is codified at 28 U.S.C. § 2244(d) and it provides:

> (1)    A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –
>
> > (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> >
> > (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
> >
> > (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)     the date on which the facts supporting the claim or claims
        presented could have been discovered through the exercise of due
        diligence.

(2)     The time during which a properly filed application for State post-
        conviction or other collateral review with respect to the pertinent judgment
        or claim is pending shall not be counted toward any period of limitation
        under this section.

28 U.S.C. § 2244(d).

The statute of limitations set out in § 2244(d)(1) must be applied on a claim-by-claim

basis. Fielder v. Varner, 379 F.3d 113 (3d Cir. 2004), *cert denied*, 543 U.S. 1067 (2005). In

analyzing whether a petition for writ of habeas corpus has been timely filed under the one-year

limitations period, a federal court must undertake a three-part inquiry. First, the court must

determine the "trigger date" for the one-year limitations period pursuant to section 2244(d)(1).

Second, the court must determine whether any "properly filed" applications for post-conviction

or collateral relief were pending during the limitations period that would toll the statute pursuant

to section 2244(d)(2). Third, the court must determine whether any of the other statutory

exceptions or equitable tolling should be applied on the facts presented.

The three claims raised by Petitioner in his Habeas Petition concern matters which

occurred at the time of trial. They do not involve newly enunciated constitutional rights and are

not based on facts that were discovered at a later date. Furthermore, there were no state-created

impediments that prevented Petitioner from raising the claims sooner. Consequently, the "trigger

date" for Petitioner's one-year limitations period is the date on which his judgment of sentence

became final, which, in this case, was the last day that Petitioner had to file a petition for writ of

certiorari in the United States Supreme Court. *See* Swartz v. Meyers, 204 F.3d 417, 419 (3d Cir.

2000) (noting that a judgment becomes final at the conclusion of direct review or the expiration

of time for seeking such review, including the time limit (90 days) for filing a writ of certiorari in the Supreme Court). In this case, the Pennsylvania Supreme Court denied Petitioner's Petition for Allowance of Appeal on April 25, 2012, and he had ninety-days from that day, or until July 24, 2012, to file a petition for writ of certiorari. He did not file a petition for writ of certiorari, so his judgment of sentence became final on July 24, 2012. Absent any tolling for "properly filed" applications for post-conviction relief, Petitioner had until July 24, 2013 to file a timely federal habeas petition challenging his conviction. For purposes of the prisoner mailbox rule, Petitioner's Habeas Petition was filed on December 6, 2016, the date he signed it, so the Court must determine whether Petitioner can take advantage of the tolling provision in section 2244(d)(2).

Section 2244(d)(2) provides that the one-year limitations period is tolled during the pendency of a "properly filed" state post-conviction proceeding. Petitioner filed his first PCRA petition on December 5, 2012, at which time 133 days of his one-year limitations period had expired (July 25, 2012 thru December 4, 2012). Those proceedings were "properly filed," and, as such, the statute of limitations was tolled until they concluded when the Pennsylvania Supreme Court denied Petitioner's Petition for Allowance of Appeal on December 30, 2014. The statute of limitations started to run again the following day, and, at that point in time, Petitioner only had 232 days (365-133=232) remaining to file a timely habeas petition, or until August 19, 2015. As previously noted, he did not file his Habeas Petition until December 6, 2016, over a year after the statute of limitations expired.

Petitioner appears to argue that he is entitled to tolling for the time his second PCRA petition was pending in the state courts. While Petitioner did file a second PCRA petition on September 19, 2014, that petition was dismissed as untimely and was thus not "properly filed"

within the meaning of section 2244(d)(2).  *See* <u>Artuz v. Bennett</u>, 121 S. Ct. 361, 364 (2000) (An application for state post-conviction relief or collateral review is "properly filed" as required to toll AEDPA's statute of limitations period for filing a federal habeas petition "when its delivery and acceptance are in compliance with the applicable laws and rules governing filings[,]" notwithstanding the substance or merits of the claims contained within the application itself. These "applicable laws and rules governing filings" usually prescribe "the form of the document, the time limits upon its delivery, the court and office in which it must be lodged, and the requisite filing fee . . . .").  *See also* <u>Pace v. DiGuglielmo</u>, 544 U.S. 408, 417 (2005) (a federal court is bound by a state court's finding that a petitioner's PCRA petition was untimely, even where the petitioner sought to pursue his PCRA petition under a statutory exception to the PCRA's time bar.  Therefore, the pendency of those proceedings cannot be tolled.

Petitioner also argues that he is entitled to tolling for the time his two motions for DNA testing were pending in the state courts.  The Third Circuit Court of Appeals has yet to resolve the question of whether a post-conviction request for DNA testing in Pennsylvania constitutes a "properly filed application for . . . other collateral review" under section 2244(d)(2).

Petitioner's motions were filed pursuant to 42 Pa. C.S.A. § 9543.1, which states, in relevant part:

> An individual convicted of a criminal offense in a court of this Commonwealth and serving a term of imprisonment or awaiting execution because of a sentence of death may apply by making a written motion to the sentencing court for the performance of forensic DNA testing on specific evidence that is related to the investigation or prosecution that resulted in the judgment of conviction.

42 Pa. C.S.A. § 9543.1(a)(1).  If the request for DNA testing is granted, the statute stipulates that "the applicant may, pursuant to section 9545(b)(2) (relating to jurisdiction and proceedings), during the 60-day period beginning on the date on which the applicant is notified of the test

results, petition to the court for post conviction relief pursuant to section 9543(a)(2)(vi) (relating to eligibility for relief)." 42 Pa. C.S.A. § 9543.1(f)(1).

Pennsylvania state courts have recognized that "[p]ost conviction DNA testing does not directly create an exception to § 9545's one-year time bar . . . . Rather it allows for a convicted individual to first obtain DNA testing which could then be used within a PCRA petition to establish new facts in order to satisfy the requirements of an exception under 42 Pa. C.S. § 9545(b)(2)." Commonwealth v. Weeks, 831 A.2d 1194, 1196 (2003). In other words, a motion for post-conviction DNA testing does not constitute an application for collateral review in and of itself; rather, it is a motion to obtain evidence, which, if favorable, could then be used in support of an application for collateral review.

Three Circuit Courts of Appeals that have confronted this issue have come to the same conclusion. The Eleventh Circuit Court of Appeals held that Florida's DNA testing statute does not toll AEDPA's statute of limitations because it "involves an application for discovery only, pursuant to which the court lacks authority to order relief from the movant's sentence or conviction based on the DNA test results." Brown v. Secretary for Dept. of Corrections, 530 F.3d 1335, 1337 (11th Cir. 2008). Consistent with the Eleventh Circuit, the Seventh Circuit Court of Appeals also held that a motion for DNA testing in Illinois does not toll AEDPA's statute of limitations because a successful motion merely entitles the petitioner to evidence, not release, under Illinois' DNA statute. See Price v. Pierce, 617 F.3d 947, 952-53 (7th Cir. 2010). The Tenth Circuit Court of Appeals followed suit and held that a prisoner's post-conviction motion for DNA testing in Kansas did not toll AEDPA's statute of limitations because it is merely as request for discovery and not a request for relief from a judgment of sentence. Woodward v. Cline, 693 F.3d 1289, 1293 (10th Cir. 2012). Finally, although not specifically

addressing a post-conviction motion for DNA testing, the Second and Ninth Circuit Courts of Appeals have held that a petitioner's state-court motion or petition to obtain additional documents or discovery does not toll AEDPA's statute of limitations. *See* Hodge v. Greiner, 269 F.3d 104, 107 (2d Cir. 2001); Ramirez v. Yates, 571 F.3d 993, 999-1000 (9th Cir. 2009) (following Hodge).

The Fifth Circuit Court of Appeals has reached the opposite conclusion with respect to Texas' DNA testing statute. In Hutson v. Quarterman, 508 F.3d 236 (5th Cir. 2007), the Fifth Circuit held that Texas' DNA testing statute did constitute an application for collateral review that tolls AEDPA's statute of limitations. However, unlike the DNA testing statutes at issue in Brown, Price and Woodward, the Texas DNA testing statute provides for an automatic judicial reconsideration of the judgment imposing the applicant's sentence. Specifically, after granting DNA testing and examining the results,

> the convicting court shall hold a hearing and make a finding as to whether it is reasonably probable that the person would not have been convicted had the results been available during the trial of the offense. If the convicting court decides that the finding is favorable to the convicted person . . . , the court may release the convicted person on bail . . . .

Hutson, 508 F.3d at 238-39 (internal footnotes omitted). The Fifth Circuit characterized a number of Texas state court opinions as equating "the Texas statute providing for post-conviction DNA proceedings with habeas corpus proceedings in that both make a collateral inquiry into the validity of the conviction." Id. at 239 (internal quotation and footnote omitted).

Unlike Texas, but similar to Florida, Illinois and Kansas, a motion for post-conviction DNA testing in Pennsylvania does not provide for an automatic judicial reconsideration of the judgment imposing the applicant's sentence, or for immediate release, but rather entitles an applicant only to discovery that can then be used to support a subsequently filed PCRA petition.

As such, Petitioner's two motions for DNA testing did not toll any portion of his one-year statute of limitations under section 2244(d)(2).

In an effort to excuse the untimely filing of his Habeas Petition, Petitioner argues that he is actually innocent of shooting and killing his grandfather. *See* (ECF No. 15-6.) In this regard, the Supreme Court has held that a credible showing of actual innocence can overcome AEDPA's one-year statute of limitations for filing habeas petition. McQuiggin v. Perkins, 569 U.S. 383, 392, 397 (2013). "This rule, or fundamental miscarriage of justice exception, is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocence persons." Herrera v. Collins, 506 U.S. 390, 404 (1993). However, to invoke this exception, the Supreme Court has stressed that a petitioner "must show that it is more likely than not that no reasonable juror would have convicted him in the light of [ ] new evidence." McQuiggin, 569 U.S. at 399 (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)). It further stressed the demanding nature of this standard by stating that "[t]hey gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" Id. at 401 (quoting Schlup, 513 U.S. at 316)).

The evidence to which Petitioner points that purportedly supports his innocence is neither new nor exculpatory. Instead, Petitioner simply challenges the presentation and characterization of the DNA evidence that was presented at his trial and relies on the lack of direct evidence that would establish his guilt. This does not demonstrate a credible claim of innocence under the governing standard, and thus the "actual innocence" exception to the limitations period is not applicable. *See* Bousley v. United States, 523 U.S. 614, 623 (1998) (actual innocence means factual innocence, not mere legal insufficiency).

Finally, Petitioner suggests that he should be granted "equitable tolling" because he pursued his rights diligently and was prevented from filing a timely habeas petition because he had to file a second PCRA petition in order to "address an issue that was left out of his 1st PCRA due to [g]overnment [i]nterference . . . ." (ECF No. 15-6, p.2.)  The alleged governmental interference referenced by Petitioner apparently relates to Judge Todd's recharacterization of the motion Petitioner filed on December 5, 2012 to be a PCRA petition.  Petitioner maintains that had he been given the appropriate time to research and file a developed PCRA petition, which he states that he specifically requested if the court were to characterize his motion as a PCRA petition, then he would have been able to present a claim regarding a <u>Miranda</u> violation (claim two in the instant Habeas Petition) that he claims he ultimately had to raise in a second PCRA petition because of Judge Todd's "hasty interference" with his first PCRA proceedings and because his initial PCRA counsel, Attorney Pass, failed to present certain claims that Petitioner requested he present.  He states that the instant Habeas Petition was untimely filed because he had to file that second PCRA petition.  *See* (ECF No. 12-8, pp.1-6.)

Despite the fact that Judge Todd found no merit to Petitioner's complaints about Attorney Pass failing to present certain claims that Petitioner allegedly requested he present, *see* (ECF No. 12-8, p.12-13), the circumstances described by Petitioner do not rise to the level of "extraordinary" that would justify granting equitable tolling.  *See* <u>Holland v. Florida</u>, 560 U.S. 631, 649 (2010).  As such, the Habeas Petition will be dismissed as untimely.  However, out of an abundance of caution, the Court will proceed to review Petitioner's three claims as if they were not time-barred.

### E.  **AEDPA Standard of Review**

Pursuant to the AEDPA, a federal habeas court may overturn a state court's resolution of the merits of a constitutional issue only if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  The phrase "clearly established Federal law," as the term is used in section 2254(d)(1) is restricted "to the holdings, as opposed to the dicta of [the United States Supreme Court] decisions as of the time of the relevant state-court decision."  Williams v. Taylor, 529 U.S. 362, 365 (2000).

If a petitioner is able to satisfy the requirements of § 2254(d)(1), then the state court decision is not entitled to deference under AEDPA and the federal habeas court proceeds to a *de novo* evaluation of the constitutional claim on the merits.  *See* Tucker v. Superintendent Graterford SCI, 677 F. App'x 768, 776 (3d Cir. 2017) (citing Panetti v. Quarterman, 551 U.S. 930, 953 (2007) ("When . . . the requirement set forth in § 2254(d)(1) is satisfied[,] [a] federal court must then resolve the claim without the deference AEDPA otherwise requires.").  Indeed, the Third Circuit recently explained that,

> [w]hile a determination that a state court's analysis is contrary to or an unreasonable application of clearly established federal law is necessary to grant habeas relief, it is not alone sufficient.  That is because, despite applying an improper analysis, the state court still may have reached the correct result, and a federal court can only grant the Great Writ if it is "firmly convinced that a federal constitutional right has been violated," Williams, 529 U.S. at 389, 120 S.Ct. 1495. *See also* Horn v. Banks, 536 U.S. 266, 272, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002) ("[w]hile it is of course a necessary prerequisite to federal habeas relief that a prisoner satisfy the AEDPA standard of review . . . none of our post-AEDPA cases have suggested that a writ of habeas corpus should automatically issue if a prisoner satisfies the AEDPA standard").  Thus, when a federal court reviewing a habeas petition concludes that the state court analyzed the petitioner's claim in a manner that contravenes clearly established federal law, it then must proceed to review the merits of the claim *de novo* to evaluate if a constitutional

violation occurred.  *See* <u>Lafler v. Cooper</u>, 566 U.S. 156, 174, 132 S.Ct. 1376, 182 L.Ed.2d 398 (2012).

<u>Vickers v. Superintendent Graterford SCI</u>, 858 F.3d 841, 848-89 (3d Cir. 2017) (internal footnote omitted).

The AEDPA further provides for relief if an adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  Under § 2254(d)(2), a state court decision is based on an "unreasonable determination of the facts" if the state court's factual findings are "objectively unreasonable in light of the evidence presented in the state-court proceeding," which requires review of whether there was sufficient evidence to support the state court's factual findings.  *See* <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).  Within this overarching standard, a petitioner may attack specific factual determinations that were made by the state court, and that are subsidiary to the ultimate decision.  Here, § 2254(e)(1) comes into play, instructing that the state court's determination must be afforded a presumption of correctness that the petitioner can rebut only by clear and convincing evidence.  <u>Lambert v. Blackwell</u>, 387 F.3d 210, 235 (3d Cir. 2004).

**F.  <u>Discussion</u>**

**1.  <u>Claim 1: Ineffective Assistance of Counsel</u>**

Petitioner's first claim involves allegations of ineffective assistance of counsel.  As it is phrased in his Habeas Petition, Petitioner claims that he was denied the effective assistance of counsel "when counsel exaggerated/falsified facts concerning DNA Evidence in a way that only hurt the defense, Counsel allowed The Commonwealth to exaggerate and falsify facts without objection and took no measure to ensure that important evidence was properly represented[.]"

(ECF No. 15, p.6.)  In discussing this claim, Petitioner maintains that his attorney for his preliminary hearing, James Ecker, was ineffective for "failing to investigate" and "understand the facts and law" regarding the stain/DNA sample that was recovered from Petitioner's boot and that had he done so his case would not have been bound over for trial.  Id. at p.10.  Petitioner also maintains that his trial counsel, Robert Foreman, was ineffective for failing to understand the same "facts and law" and as a result he failed to ensure that the DNA evidence was "properly represented and not exaggerated" at trial.  Id.  He further maintains that his direct appeal counsel, Thomas Farrell, was ineffective for failing to raise a claim regarding Attorney Foreman's ineffectiveness and that his PCRA counsel, Charles Pass III, was ineffective for failing to raise claims challenging the effectiveness of both Attorney Farrell and Attorney Foreman.  Id. at p.14.  Finally, he maintains that Judge Todd erred and abused his discretion by ruling that the DNA sample on Petitioner's boot was correctly identified as blood from the victim.  Id.

The "facts and law" that Petitioner states his counsel failed to understand, and which form the basis of his claims of ineffectiveness, appear to be based on the admissibility and/or weight to be afforded to phenolphthalein test results, presumptive evidence of the presence of blood.  While Petitioner raised numerous ineffective assistance of counsel claims in his post-conviction proceedings, the factual basis of this particular claim, however, was never raised in those proceedings.  For purposes of the exhaustion requirement in 28 U.S.C. § 2254(b)(1), "[b]oth the legal theory and the facts on which a federal claim rests must have been presented to the state courts."  Gibson v. Scheidemantel, 805 F.2d 135, 138 (3d Cir. 1986) (citing Picard v. Connor, 404 U.S. 270, 275 (1971)).  "This requires that the claim brought in federal court be the substantial equivalent of that presented to the state court."  Id.  Since Petitioner did not give the state court an opportunity to act on this claim before he raised it in his Habeas Petition, it is

unexhausted before this Court. *See* <u>O'Sullivan v. Boerckel</u>, 526 U.S. 842 (1999) ("Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court. In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition.")

Furthermore, this claim is also procedurally defaulted since it is now barred by the statute of limitations contained in the PCRA, 42 Pa. C.S.A. § 9545(b). *See* <u>Rolan v. Coleman</u>, 680 F.3d 317 (3d Cir. 2012) ("Procedural default occurs when a claim has not been fairly presented to the state courts . . . and there is no additional state remedies available to pursue . . . or, when an issue is properly asserted in the state system but not addressed on the merits because of an independent and adequate state procedural rule . . . .).

Nevertheless, a petitioner whose constitutional claims have not been addressed on the merits due to procedural default can overcome the default, thereby allowing federal court review, if he or she can demonstrate either: (1) "cause" for the default *and* "actual prejudice" as a result of the alleged violation of federal law; or (2) that the failure to consider the claim will result in a "fundamental miscarriage of justice." <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991). Petitioner has demonstrated neither. However, given the allegations of ineffective assistance of PCRA counsel, it appears that Petitioner may be attempting to take advantage of <u>Martinez v. Ryan</u>, 132 S. Ct. 1309 (2012), where the Supreme Court held that "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's default of a claim of ineffective assistance at trial." <u>Martinez</u>, 132 S. Ct. at 1315. This requires that a petitioner "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." <u>Id</u>. at 1318. However, a substantial claim alone is not sufficient to excuse a petitioner's

procedural default. The Supreme Court held that state post-conviction counsel must also be "ineffective under the standards of <u>Strickland v. Washington</u>" to excuse the procedural default of the underlying claim. <u>Martinez</u>, 132 S. Ct. at 1318. In sum, if a petitioner "shows that his underlying ineffective-assistance-of-trial-counsel claim has some merit and that his state post-conviction counsel's performance fell below an objective standard of reasonableness, he has shown sufficient prejudice from counsel's ineffective assistance that his procedural default must be excused under <u>Martinez</u>." <u>Workman v. Superintendent Albion SCI, 915 F.3d 928, 941 (3d Cir. 2019).</u>

The following background is relevant to this claim. At trial, it was revealed that there were six samples of staining identified on Petitioner's right boot that were tested for the presumptive presence of blood, only one of which yielded a positive result. (T., p.235.) That stain was later tested for DNA which revealed a major component profile that matched the victim's DNA profile. (T., pp.235-36, 239.) In other words, the sample that tested positive for the presumptive presence of blood contained Nathaniel Caldwell's DNA. (T., p.239.) Statistical analysis performed on that DNA profile showed that Nathaniel Caldwell was 21 quintillion times more likely than another unrelated black person chosen at random to have been a contributor to the sample, while the number generated for the Caucasian population was 1 in 43 quintillion, and in the Hispanic population 1 in 110 quintillion. (T., p.242.) According to Robert Askew, the Serologist who testified at Petitioner's trial, confirmatory tests are not performed when a sample tests positive for the presumptive presence of blood because "the presumptive positive result is the more conservative of the two tests." (T., p.232.)

Even though it tested positive under the presumptive test, Petitioner claims that the sample in question should not have been called "blood" because it was never verified as blood

through a confirmatory test, which he claims is required before a sample can be identified as blood. (ECF No. 15, p.11.)  In support of his position, Petitioner relies on a criminal case out of the District of Hawaii, United States v. Williams, No. 06-79, 2013 WL 4518215 (D. HI, Aug. 26, 2013), where the defendant argued that the "results of phenolphthalein testing on their own, without confirmatory testing, is inadmissible." Id., at *8.  However, that court ruled that the defendant's objection to the admissibility of the evidence was moot because the government did not intend to introduce evidence of the phenolphthalein testing unless there was further confirmatory testing performed.  Id.

While there is no controlling case law in Pennsylvania, the admissibility of a presumptive blood test was addressed by the Pennsylvania Superior Court in Commonwealth v. Hetzel, 822 A.2d 747 (Pa. Super. Ct. 2003).  In Hetzel, the court stated that

> [i]n considering whether presumptive test results such as the phenol test are admissible, some states hold that the test results satisfy the fundamental requirements of expert testimony in that they constitute specialized knowledge that is beyond that of the average layperson and so are helpful to the jury. *See* Stenson, *supra* at 1263 (collecting cases that admit presumptive tests, including People v. Coleman, 759 P.2d 1260 (1988); State v. Moseley, 445 S.E.2d 906 (1994); Johnston v. State, 497 So.2d 863 (Fla.1986); Graham v. State, 374 So.2d 929 (Ala.Crim.App.1979)).  With regard to the possibility that some substance other than blood may trigger a positive test, courts rely on the fact that the jury was made aware of such possibilities and the issue then becomes one of weight to be accorded the evidence, not admissibility. *See* Stenson, *supra*, at 1264-65. *See also* Commonwealth v. Duguay, 720 N.E.2d 458 (1999) (fact that substances other than blood can trigger positive result in ortho-tolidine test goes to weight, not admissibility); State v. Leep, 569 S.E.2d 133 (2002) (limitations on STD test results do not render it inadmissible; they affect only weight).

Hetzel, 822 A.2d at 762.  Acknowledging that some states deem presumptive blood tests like phenol inadmissible where they form the basis of an expert's opinion that blood was present, the Superior Court recognized that the expert gave no such testimony in that case.  Id. (citing State v. Moody, 573 A.2d 716 (1990)).  Instead, the expert's opinion "was not that the water surely

22

contained blood, but rather that it had an indication of blood, a fact confirmed by the presumptive test she conducted." Id.

Petitioner states that he is not challenging the admissibility of the presumptive blood test results but argues that his trial counsel should have highlighted its limitations and not referred to the sample as blood without it being confirmed as such. (ECF No. 15, p.12.) However, much like the expert who testified in Hetzel, Mr. Askew also testified that the sample from Petitioner's right boot tested positive only for the presumptive presence of blood, which he explained was the result of a "very simple chemical test which takes advantages of the oxidation of blood." (T., p.231.) He did not testify that the stain was, in fact, blood, and explained that "[a]ny reaction can produce that oxygen and produce a highly oxidated material and can yield a positive result. That is why this is a presumptive test." (T., pp.231-32.) Therefore, like Hetzel, the jury was made aware that a substance other than blood can trigger a positive result and was not left with the impression that the test was conclusive for the presence of blood. Furthermore, limitations of that test and DNA testing were exposed when, on cross-examination, Mr. Askew admitted that the technology used did not enable him to place an age on the sample that he tested and that anomalies can occur in chemical processing. (T., pp.244, 246.) This allowed trial counsel to argue in closing that the stain on Petitioner's boot could have been an old stain, which would not be unexpected since Petitioner and the victim lived and worked together.[4] (Closing Arg. T., p.7.) Accordingly, just as the Superior Court found in Hetzel, the results of the presumptive test in this case specifically "assisted the trier of fact" and "[a]ny uncertainties went to the weight to be

---

[4] Although not relevant to the presumptive test, trial counsel also argued that the DNA testing on the stain was not reliable because one of the loci displayed an allele or human marker which Mr. Askew testified may have been the result of "the presence of DNA from more than one individual" or "technical artifacts". (T., pp.246-47); (Closing Arg. T., pp.6-7.)

accorded to the results," which trial counsel "aptly brought out on cross-examination." <u>Hetzel</u>, 822 A.2d at 763.

To undergo a review of whether Petitioner's claim is "substantial" under the standard contemplated by <u>Martinez</u>, the Court must look to the law governing ineffective assistance of counsel claims. The familiar two-prong test for such claims was set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). Under <u>Strickland</u>, a habeas petitioner must demonstrate that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's error, the result would have been different. <u>Id</u>. at 687. For the deficient performance prong, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." <u>Id</u>. at 688. To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id</u>. at 694. With respect to the sequence of the two prongs, the <u>Strickland</u> Court held that "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." <u>Id</u>. at 697.

Under the standards enunciated by the Supreme Court in <u>Strickland</u>, trial counsel was not ineffective in the manner Petitioner describes with regard to the sample recovered from his boot, nor were any subsequent counsel ineffective in failing to challenge trial counsel's handling of said sample at trial, including the DNA evidence derived therefrom. To the extent Petitioner

specifically challenges the reference of the sample as "blood" by his trial counsel,[5] the Commonwealth and Judge Todd, he suffered no prejudice since it was made clear to the jury that the sample tested positive only for the presence of blood and that other substances can also produce a positive result. Most importantly, however, Petitioner was not prejudiced because the potential absence of blood did not preclude the fact that the victim's DNA was a major contributor to the sample. Therefore, the Court finds that Petitioner's claim is not "substantial" as that term has been defined by the Supreme Court.[6]

Also, a part of this claim is an argument Petitioner makes involving the ineffectiveness of his counsel at his preliminary hearing presumably for not properly challenging the stain found on Petitioner's boot that was alleged to be the victim's blood. Petitioner maintains that the blood found on his boot was the sole reason the magistrate held the case over for trial and that had his attorney for his preliminary hearing made the same arguments Petitioner claims that his trial counsel should have made, mainly that the sample could not be referred to as blood because no

_____

[5] While there were times throughout the trial that the sample was referred to as "blood," trial counsel took pains in his closing argument to highlight the fact that it was merely a stain, even referring to it as a "material" and "biological fluid". (Closing Arg. T., p.7.) Furthermore, it was the defense's position that even if it was blood, it was an old stain, and it had the DNA of both Petitioner and the victim because they lived and worked together. Id. This was not an unreasonable trial strategy.

[6] The case on which the Supreme Court based its description of what a "substantial claim" entails concerns the standards for issuing a certificate of appealability. Martinez, 132 S. Ct. at 1318-19 (citing Miller-El v. Cockrell, 537 U.S. 322 (2003)). In order for a petitioner to demonstrate that his claim has "some merit" under this standard, he must "show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 336 (internal citation, quotation marks and alteration omitted). By relying on this standard, the Supreme Court implied that the underlying ineffective assistance of trial counsel claim must be evaluated under a standard less exacting than Strickland prejudice. Workman, 915 F.3d at 939.

25

confirmatory testing had been performed, then there would not have been enough evidence to establish a prima facie case. For substantially the same reasons noted above with regard to trial counsel, Petitioner's ineffective assistance of preliminary hearing counsel is also not a "substantial" claim.

In sum, Petitioner has failed to overcome the procedural default of claim one. Therefore, even though the Habeas Petition is time-barred, this claim is denied in the alternative.

## 2. Claim Two: Ineffective Assistance of Counsel

Petitioner's second claim involves allegations of ineffective assistance of counsel regarding his counsels' failure to seek suppression of any and all evidence obtained as a result of custodial interrogations that took place without him first being read his Miranda[7] warnings. In support of this claim, Petitioner refers to the testimony of Detective Satler at the preliminary hearing on April 27, 2007. Specifically, Detective Satler testified on cross-examination as follows:

Q:      Let me ask you this. Did you record or take his statements?

A:      No.

Q:      By video or audio or anything else?

A:      No.

Q:      Did you read Miranda Rights?

A:      No.

Q:      So anything he told you was -- he was not Mirandized, is that correct?

A:      That's correct.

---

[7] Miranda v. Arizona, 382 U.S. 436 (1966)

26

(Prelim. Hear. T., p.33-34.)

      The first time Petitioner presented this claim to the state courts was in what the court considered his second PCRA petition that he filed on September 19, 2014.  That petition was dismissed as untimely under the PCRA statute of limitations, but Judge Todd nevertheless explained that Detective Satler's interview with Petitioner was not a custodial interrogation that required him to be given Miranda warnings.  This was because Petitioner was not in custody and he voluntarily consented to speak to Detective Satler.  Also, Petitioner was not arrested and was taken home after the interview.  In response to the court's notice of intent to dismiss the second PCRA petition as time-barred, Petitioner alleged that the claim should be considered timely because he repeatedly informed Attorney Pass, his PCRA counsel, that he wanted to raise the Miranda issue but his counsel did not raise it.  Judge Todd, however, did not credit Petitioner's objections, specifically noting that Petitioner did not raise the claim on appeal from the dismissal of his first PCRA petition even though he raised 18 issues for review by the Superior Court. Judge Todd also noted that while Petitioner did request his PCRA counsel to raise various issues, all those issues were addressed in counsel's Brief in Support of his Motion to Withdraw under Turner/Finley and none involved trial counsel's failure to seek suppression of evidence due to a Miranda violation.  *See* (ECF No. 12-8, pp.7-13.)  On appeal, the Superior Court affirmed the dismissal of the second PCRA petition as untimely.  (ECF No. 13-5, pp.1-4.)

      Like claim one, this claim is also procedurally defaulted.  Although Petitioner did present this claim to the state courts, he did not do so in a timely filed PCRA petition and a federal court ordinarily may not review a claim on the merits if the state court's denial of relief is based on a state procedural rule that rests on a state law ground that is independent of the federal question and adequate to support the judgment.  Coleman v. Thompson, 501 U.S. 722, 729 (1991).  The

Supreme Court has explained that state procedural rules are "independent" if they do not depend for their resolution on answering any federal constitutional question, *see*, *e.g.*, Ake v. Oklahoma, 470 U.S. 68, 75 (1985), and they are inadequate if they are not "firmly established and regularly followed," Ford v. Georgia, 498 U.S. 411, 424 (1991), or if they are "novel [ ]" and unforeseeable. NAACP v. Alabama es rel. Patterson, 357 U.S. 449, 457 (1958); *see also* Ford, 498 U.S. at 424. A state procedural ground for denying a PCRA claim in Pennsylvania includes the PCRA's timeliness requirement, 42 Pa. C.S. § 9545(b), which requires that a petitioner file his PCRA petition within one-year of his conviction becoming final. This statutory law is "independent" of federal law, and since at the time Petitioner filed his PCRA petition Pennsylvania courts consistently and regularly denied review of claims when not filed within the time proscribed by § 9545(b), it was also "adequate". *See* Commonwealth v. Murray, 753 A.2d 201, 203 (Pa. 2000) (time requirement for filing PCRA petition is mandatory and jurisdictional in nature), *abrogated on other grounds by* Commonwealth v. Brown, 943 A.2d 264 (Pa. 2008).

Once again, Petitioner can overcome this procedural default if he can demonstrate cause and prejudice or a fundamental miscarriage of justice, *see* Coleman, 501 U.S. at 750, but, recognizing that the claim is defaulted, he again appears to rely on Martinez, contending that it was the ineffectiveness of his PCRA counsel, Attorney Pass, that caused the default of this claim. (ECF No. 15, pp.16-17.) He claims that Attorney Pass never met or spoke with him in person and only wrote two letters to him even after he allegedly informed Pass that he had additional issues that he wanted to present. (ECF No. 15, p.17.) The PCRA court, however, found no merit to these allegations and pointed out that Petitioner himself raised 18 issues for review in his PCRA appeal, which he filed *pro se*, and none of the issues presented related to counsel's ineffectiveness for failing to seek suppression of evidence because of the purported Miranda

violation. Notwithstanding the fact that Petitioner's allegations against Attorney Pass appear to be unsupported by the record, Petitioner has not demonstrated that this claim is "substantial" as that term is defined in <u>Martinez</u> and he therefore cannot overcome its default.

Pursuant to <u>Miranda</u>, statements made by a defendant during a custodial interrogation must be suppressed unless the defendant was provided certain warnings and voluntarily, knowingly, and intelligently waived his or her right to have an attorney present during the interrogation. 384 U.S. at 475. The Supreme Court has emphasized that whether a suspect is "in custody" is an objective inquiry.

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.

<u>Thomas v. Keohane</u>, 516 U.S. 99, 112 (1995) (internal quotation marks, alteration, and footnote omitted). Courts undertaking this inquiry must "examine all of the circumstances surrounding the interrogation," including any circumstances that "would have affected how a reasonable person" in the suspect's position "would perceive his or her freedom to leave." <u>Stansbury v. California</u>, 511 U.S. 318, 322, 325 (1994). The "subjective views harbored by either the interrogating officers or the person being questioned" are irrelevant. <u>Id</u>. at 323. In other words, the test involves no consideration of the "actual mindset" of the particular suspect subjected to police questioning. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 668 (2004). Ultimately, however, the determinative question is whether the person was subject to "'a formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983) (quoting <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977)).

The circumstances of Petitioner's interview with police following the murder were detailed by Detective George Satler who testified at trial that about an hour after he arrived on scene, Petitioner agreed to be transported to police headquarters for an interview. (T., pp.157-58.) He said that his interview with Petitioner began at approximately 7:45 p.m and was conducted in an eight by eight room in the homicide office. (T., pp.157-58.) When asked what his interview consisted of, he testified that it was "to get some background information and find out his relationship with the victim." (T., p.159.) This included finding out how long Petitioner had lived with his grandfather and where he lived in the residence, and that information was relayed back to detectives who were processing the scene in order to assist in locating items and make sure they didn't overlook anything during the initial investigation. (T., p.159.) He testified that the interview lasted about three to three-and-a-half hours during which time Petitioner was very cooperative and provided verbal and written consent to the collection of his DNA as well as his clothing and boots. (T., p.180.) He also consented to a gunshot residue kit in order to determine if he had recently fired a weapon. (T., pp.180-81.) Detective Satler testified that the interview with Petitioner was neither tape nor video recorded and that he did not prepare a report until after Petitioner had been taken home. (T., p.182.)

Following his interview with Detective Satler, Petitioner was interviewed by Detective Kimberly Braddick at approximately 10:45 p.m. (T., p.195.) Detective Braddick testified that before the interview with Petitioner, she read him his rights from the Miranda form at which time he agreed to speak to her. (T., p.195.) The interview lasted for about an hour to an hour-and-a-half after which she and another detective drove Petitioner home. (T., pp.199, 201.)

Although the PCRA court did not rule on the merits of Petitioner's claim that his counsel was ineffective for failing to seek suppression of evidence due to the purported Miranda

violation, the court did note that the interview with Detective Satler was not a custodial interrogation and that Petitioner was in fact read his Miranda rights before his interview with Detective Braddick. Petitioner, however, disagrees with the court's findings.

In his Habeas Petition, Petitioner states that the "interrogations conducted by Detective George Salter [sic] and Kimberly Braddick were not done voluntarily," that he was not free to leave because his belongings and cellphone had been seized, and that Detective Braddick never administered Miranda warnings despite her testimony that she did. (ECF No. 15, pp.18-19, 21.) He also states that when he asked to be transported to the hospital to check on the victim, Detective Satler told him that he could not leave because he was under arrest and the only way he would consider letting him go was if he could "pass his tests." (ECF No. 15, p.23.) According to Petitioner, this included turning over his clothes and boots and allowing them to collect his DNA and do a gunshot residue kit test. (ECF No. 15, pp.23-24.) Petitioner states that after he complied, Detective Satler still would not let him leave because Petitioner had "failed his tests" and was still under arrest. (ECF No. 15, p.24.) He then told Petitioner that he would let him go only if he passed a polygraph test. (ECF No. 15, p.24.)

Petitioner also maintains that Detective Satler never read or advised him of his rights before he consented to the search and seizure of his clothing and DNA and performance of the gunshot residue kit test and that it was Detective Satler, and not him, that checked the box on the consent to search and seizure form that read, "Do you understand each of these rights that have been explained to you?". (ECF No. 15, pp.24-25.) Petitioner claims that he signed his name on the form only because he "was under the impression [he] had to meet all of Detective Salter's [sic] demands in order to be released." (ECF No. 15, p.25.) Petitioner maintains that had his attorneys, which includes counsel for his preliminary hearing through counsel for his PCRA

proceedings, sought to suppress the statements and evidence obtained from his interviews with Detectives Satler and Braddick, the case would never have gone to trial and/or the outcome of the proceedings would have been different. (ECF No. 15, pp.26-28.)

There is nothing in the state court record supporting the allegations made in Petitioner's Habeas Petition against Detectives Satler and Braddick. In fact, as far as the Court can tell, this is the first time that Petitioner has alleged that Detective Satler told him that he would not let him leave because he was under arrest. Furthermore, there is nothing to support Petitioner's statement that the claim is defaulted due to the fault of PCRA counsel because he only requested that his PCRA counsel raise his "most meritorious issues" and not this specific Miranda violation issue.[8] Moreover, Petitioner himself did not include this claim on appeal from the PCRA that he filed *pro se* and in which he raised 18 issues for review. Most importantly, however, Petitioner was not subjected to a custodial interrogation. He was taken home following his interview with detectives and was not arrested until approximately six weeks later. As such, there was no basis for any of his attorneys to seek suppression of his statements made to Detectives Satler and Braddick or the evidence seized from him that day, and thus, counsel could not have been deemed ineffective. Therefore, this claim is not a substantial claim for which procedural default could be excused under Martinez, and in addition to being time-barred, it is not subject to review because of the procedural default.

### 3.  Claim three:  Sufficiency of the Evidence

Petitioner's final claim is a challenge to the sufficiency of the evidence, specifically because 1) there was no eyewitness to the murder, 2) no one suggesting that he committed it, and

---

[8] *See* Resp't Exh. 47, ECF No. 12-5, p.41.

3) no physical or forensic evidence linking him to the actual shooting of the victim. (ECF No. 15, p.29.) Petitioner raised this claim on direct appeal, and it was adjudicated on the merits. As such, it is deemed exhausted for purposes of federal habeas review, and the inquiry before this Court is whether the Superior Court's adjudication of this claim was contrary to, or involved an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

The clearly established federal law to analyze a sufficiency of the evidence claim is set forth in Jackson v. Virginia, 443 U.S. 307, 324 (1979), where the United States Supreme Court held that "in a challenge to a state conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." In a federal habeas corpus proceeding where the sufficiency of the evidence is in contention:

> [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt . . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Jackson, 443 U.S. at 318-19 (internal citations omitted) (emphasis in original). *See also* Robertson v. Klem, 580 F.3d 159, 165 (3d Cir. 2009); Orban v. Vaughn, 123 F.3d 727, 731-33 (3d Cir. 1997).

In applying the Jackson standard, the reviewing court must consider each substantive element of the criminal offense at issue as defined under state law. Coleman v. Jackson, 132 S. Ct. 2060, 2064 (2012); Jackson, 443 U.S. at 324, n.16. "While the elements of a criminal conviction are to be defined by state law, a reviewing court's determination of whether sufficient

evidence was produced to satisfy each element is governed by federal law.  Vaughter v. Folino, 2014 WL 1152540, at *15 (E.D. Pa. Mar. 24, 2014) (citing Coleman, 132 S. Ct. at 2064).

### a.  **"Contrary to"**

In this case, both the trial judge (in his Pa. R.A.P. 1925(a) Opinion) and the Pennsylvania Superior Court applied a well-known Pennsylvania test for evaluating a challenge to the sufficiency of the evidence set forth by the Pennsylvania Superior Court in previous decisions. *See* (Resp't Ex. 11, ECF No. 10-3, p.9) (citing Commonwealth v. McNair, 603 A.2d 1014 (Pa. 1992).  *See also* (Resp't Ex. 15, ECF No. 10-7, pp.4-5) (citing Commonwealth v. O'Brien, 939 A.2d 912, 913 (Pa. Super. Ct. 2007).  While neither state court cited to Jackson, the Third Circuit has found that the Pennsylvania test for sufficiency of the evidence challenges is identical to the federal standard set forth in Jackson.  *See* Evans v. Court of Common Pleas, Delaware County, 959 F.2d 1227, 1233 (3d Cir. 1992) ("the formulation of the Pennsylvania test for insufficiency of the evidence is almost identical to that under federal law").  As such, the adjudication of this claim by the Pennsylvania Superior Court was not contrary to clearly established federal law.

### b.  **"Unreasonable application of"**

The Court's next inquiry is whether the adjudication of Petitioner's sufficiency of the evidence claim was an unreasonable application of Jackson.  The Supreme Court has said that under the "unreasonable application" clause of 28 U.S.C. § 2254(d)(1), "a federal habeas court may not grant relief simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."  Williams, 529 U.S. at 411.  The Supreme Court later expanded on this interpretation of the "unreasonable application" clause explaining that the state court's decision must be "objectively unreasonable," not merely wrong; even "clear

error" will not suffice. <u>Locklyer v. Andrade</u>, 538 U.S. 63, 75 (2003). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Harrington v. Richter</u>, 562 U.S. 86, 103 (2011).

To have been entitled to relief on this claim in his direct appeal, Petitioner had to show that the evidence, viewed in the light most favorable to the Commonwealth, was insufficient to enable a fact-finder to find beyond a reasonable doubt that he was the individual who killed the victim and that he had the specific intent to do so. The Superior Court, as required, identified the elements of first-degree murder and quoted the applicable statutory language defining an "intentional killing." (Resp't Ex. 15, ECF No. 10-7, pp.8-9).

Petitioner argued that the evidence was insufficient to prove that he was the murderer of his grandfather. In his Pa. R.A.P. 1925(a) Opinion, Judge Todd explained why he believed there was sufficient evidence to support the verdict against Petitioner. He summarized the evidence presented by the Commonwealth as follows:

> . . . . The jury was presented with evidence which established that the night before the murder Defendant and the victim had an argument or confrontation during which Defendant was told he was being forced to leave the home he had lived in for approximately two years without an apparent alternative place to live. Defendant told the police that this did not upset him but he was apparently concerned enough about being forced to leave that Defendant placed a call to 911 and the Zone 5 police station shortly after 4:00 p.m. from the residence on the day of the murder to see if, in fact, his grandfather could legally force him to leave the house and Defendant was told he could. The victim's daughter then found the victim dead in the home shortly before 5:00 p.m., less than an hour later. At approximately the same time a neighbor heard a banging noise near the rear of the apartment building and saw Defendant running from the rear of the building to the front of the building. The neighbor testified that his occurred approximately forty-five minutes before the police appeared. The police and paramedics were dispatched at 5:05 p.m., arriving within minutes and the victim

was pronounced dead at 5:08 p.m.  There was still the smell of gunpowder in the air and an examination showed that the body was still warm and that rigor had not set in.  A liver core body temperature taken by the coroner's office approximately two hours later placed the time of death two to four hours earlier, which included the period from 4:00 p.m. to 5:00 p.m.  The time line suggested by this evidence would certainly allow the jury to find that the victim was shot between the time that Defendant placed the phone call to 911 and the Zone 5 police station from the residence shortly after 4:00 p.m. and when the victim was found dead at 5:00 p.m.  This evidence not only placed Defendant in the home at approximately that time but Defendant was also seen by a neighbor running from the rear of the house, the area where the murder weapon was found and where the basement door was partially kicked in.

     The jury could also find that although the rear door was partially kicked in, it was not opened wide enough to allow an intruder to actually enter, due to the ladder blocking the door.  In addition, the basement showed no other signs of an intruder walking through it, such as footprints left in the dust on the floor.  There were no other signs of forced entry elsewhere in the residence and, therefore, the jury could conclude that the murderer was someone, such as the Defendant, who had unrestricted access to the apartment and only kicked the door in to create the appearance of a break in.  The evidence also showed that neither the victim's nor his wife's apartment had been ransacked and nothing appeared to be missing.  The victim's wallet and some coins were left untouched in the room in which he was found.  The victim was killed by his own gun, which Defendant acknowledged he knew was kept in the house.  In addition, a stain of the victim's blood was found on Defendant's shoe.  The jury could also consider Defendant's apparent knowledge that his grandfather had been shot in the head, when there was no evidence that Defendant had been in the apartment after the shooting to observe the wound or had been informed by anyone of the nature of his grandfather's fatal wound.

     The jury could reasonably find, based on the evidence adduced at trial, that Defendant became angry and upset that his grandfather was forcing him to move from the house.  When Defendant learned during his phone calls to 911 and the Zone 5 police station shortly after 4:00 p.m. that his grandfather could legally force him to leave, he then retrieved his grandfather's gun and shot and killed him.  The jury could also find that Defendant then attempted to make it appear that an intruder had entered the apartment by attempting to kick in the basement door.  Defendant was seen by the neighbor coming from the rear of the house at the time that the neighbor heard the door being kicked in.  Other evidence supported a finding that another intruder had not entered the house and items left appeared to indicate that a theft had not occurred.  Finally, the evidence of a blood stain on Defendant's shoe buttresses an argument that blood from the gunshot wound landed on Defendant's boot.

\* \* \* \*

> The jury was free to accept or reject either the Commonwealth's evidence or Defendant's attacks upon this evidence. It is also clear, however, that should the jury elect to accept the Commonwealth evidence, there was more than sufficient evidence to support the verdict that it was Defendant that committed the murder.

(Resp't Exh. 11, ECF No. 10-3, pp.9-12.) On appeal, the Superior Court referenced thr portion of Judge Todd's opinion cited above and concluded that there was amble circumstantial evidence to support Petitioner's conviction for first-degree murder. (Resp't Ex. 15, ECF No. 10-7, pp.9-12.)

The above analysis shows that in accordance with the proper standard in reviewing a sufficiency of the evidence claim, the state courts viewed the evidence in the light most favorable to the Commonwealth, as the verdict winner, and reasonably determined that the evidence was sufficient to find that Petitioner was the individual who shot and killed the victim. The Superior Court's determination was the result of an objectively reasonable application of clearly established federal law. Accordingly, Petitioner is not entitled to habeas relief on this claim even if it was not time-barred, nor is he entitled to relief to the extent he argues that he is under 28 U.S.C. § 2254(d)(2).

## G.      Certificate of Appealability

A court should issue a certificate of appealability where a petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner meets this burden by showing that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000). A certificate of appealability will be denied in this case because jurists of reason would not disagree with the Court's resolution of Petitioner's claims or conclude that they are "adequate to

deserve encouragement to proceed further." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003)

(citing <u>Slack</u>, 529 U.S. at 484). A separate Order will issue.

Dated: November 5, 2019.

_____
Lisa Pupo Lenihan
United States Magistrate Judge

Cc:    Keith Caldwell
HP-2240
SCI Dallas
1000 Follies Road
Dallas, PA 18612

Counsel of Record
(*via CM/ECF electronic mail)*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

KEITH CALDWELL,          )
                           )     Civil Action No. 16 – 1848
             Petitioner,   )
                           )
            v.               )     Magistrate Judge Lisa Pupo Lenihan
                           )
LARRY MAHALLY and THE   )
ATTORNEY GENERAL OF THE )
STATE OF PENNSYLVANIA,   )
                           )
           Respondents.  )

## ORDER

**AND NOW**, this 5th day of November, 2019;

**IT IS HEREBY ORDERED** that the Amended Petition for Writ of Habeas Corpus (ECF No. 15) is dismissed as untimely and denied in the alternative.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is denied.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment in favor of Respondents and mark this case **CLOSED**.

**AND IT IS FURTHER ORDERED** that pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, Petitioner has thirty (30) days to file a notice of appeal as provided by Rule 3 of the Federal Rules of Appellate Procedure.

Lisa Pupo Lenihan
United States Magistrate Judge